# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

ALTON G. RICHARDSON,     *

    PLAINTIFF,     *

     *

VS.     *     **CIVIL ACTION NO: 13-00469-KD-B**

     *

WARNER BROTHERS RECORDS,   *

DANNY KEY, ERIC PRESTRIDGE,   *

SHAWNA LASHAE McILWAIN   *

THOMPSON, MATTIE McILWAIN,   *

STONEY CREEK RECORDS,   *

AND DEFENDANTS "A TO Z"   *

WHOSE TRUE IDENTITIES ARE   *

CURRENTLY UNKNOWN,   *

     *

    DEFENDANTS.     *

FILED OCT 7 '13 AM 9:28 USDC-ALS

## AMENDED COMPLAINT

COMES NOW Plaintiff, Alton G. Richardson (hereinafter referred to as Richardson), represented Pro Se, and seeks his actual expenses, and/or compensatory and punitive damages brought about by Warner Brothers Records (Music), its aforementioned Defendant employees, Danny Key and Eric Prestridge, Defendants Shawna McIlwain Thompson, Mattie McIlwain, and Stoney Creek Records, for permanent damage to Plaintiff's health and business, brought about by the unfair, illegal and deceptive actions set out in allegations of fact and counts herein:

### PARTIES

1.     Richardson is an adult resident of the State of Alabama, and more specifically,

Mobile County.

2.     Upon information and belief, Defendant, Warner Brothers Records (Music) is a legal business entity organized and existing under the laws of a state other than Alabama, which does business in Alabama.  Said Defendant conducted its business with Plaintiff from 20 Music Square East, Nashville, TN 37203.  Its corporate office is located at 10585 Santa Monica Boulevard, Los Angeles, CA 90025.  Said Warner Brothers employees who did business with Plaintiff in this said case are citizens of the United States.

3.     Upon information and belief, Defendant, Danny Key is an adult resident of a state other than Alabama, who acted as the A & R Director for Warner Brothers Records (Music) in the State of Tennessee, in past dealings with Richardson.  Key is a citizen of the United States.

4.     Upon information and belief, Defendant, Eric Prestridge is an adult resident of a state other than Alabama, who acted as a Producer for Warner Brothers Records (Music) in the State of Tennessee, in past dealings with Richardson.  Prestridge is a citizen of the United States.

5.     Upon information and belief, Defendant, Shawna Lashae McIlwain Thompson, is an adult resident of a state other than Alabama, specifically, the State of Tennessee.  Thompson is a citizen of the United States.

6.     Upon information and belief, Defendant, Mattie McIlwain is an adult resident who has lived in a state other than Alabama, believed to be Tennessee, and General Delivery,

2

Chatom, Washington County, Alabama for sixteen (16) years. First class mailings to he Chatom address were returned "rejected" and certified mail to the Chatom address has not been signed for and returned. Mattie McIlwain is a citizen of the United States.

7.    Upon information and belief, Defendant, Stoney Creek Records is a legal business entity organized and existing under the laws of a state other than Alabama. It is locatred at 207 18th Avenue South, Nashville, TN 37203. Its employees are citizens of the United States. Its main office may be in California, under the cognizant name Richard Da La Font. It is the sister label to Broken Bow Records. Richard Da La Font is untraceable in efforts conducted by the Plaintiff Richardson.

8.    Fictitious Defendants "A to Z", whose true identities are currently unknown, who or which in any way participated in the writing, record producing, marketing of "Thompson Square" music and/or the collection and/or distribution of the royalties from albums and/or live performances and/or audio or video broadcasts and/or merchandising of Thompson Square products.

<u>INTRODUCTORY FACTUAL ALLEGATIONS</u>

8.    From the time Defendant, Shawna Lashae McIlwain Thompson was eleven (11) years old, Richardson was involved with her music career. His first move was to arrange for Shawna to perform two (2) songs at the Governor's Mansion in Montgomery, Alabama, for Governor Hunt's 1000 VIP guests. Richardson was the President and CEO of Alabama Exterminating Company, Inc., a songwriter under contract with BMI, and owner

of Unknown Artists Publishing Co.  Richardson's expense was $500.00 for ten (10) hours,

$50.00 per hour of time for lost time from his company, $50.00 food, $150.00 auto rental,

and $20.00 gas for a total of $720.00.  Hereinafter, when Richardson refers to a number of

hours, said time charges are $50.00 per hour.  Further hereinafter, Defendant, Shawna Lashae

McIlwain Thompson will be referred to as "Shawna."

9.     Richardson made numerous trips to Nashville with co-writers, pushing his

songs.  He became well known by publishers, producers, writers, investors and the music

industry in general.  He received much publicity in the newspaper while Shawna was

performing locally.

10.    In early 1993, some of Nashville's top song writers were coming for weeks to

Richardson's hunting camp, hunting and writing songs.  They were given the "Key to the

City of Saraland, Alabama" and received much press coverage.  Some writers came to

Richardson's place driving top of the line cars, then Richardson would have to buy them gas

to get back to Nashville.  Richardson treated them like kings.

11.    In early 1992 or 1993, Shawna and Mr. McIlwain came to Richardson's

Hunting Camp seeking advice about recording some songs.  The McIlwains had found an ad

in the Mobile, Alabama newspaper of some Nashville people in Mobile looking for talent.

Richardson advised the McIlwains not to spend their money with these people, that they were

music sharks, because reputable Nashville people has talent knocking their doors down.

12.     The McIlwain's didn't listen to Richardson.  Shawna recorded two (2) songs in Nashville on an album with several people called "New Faces."  There was nothing wrong with the quality of the album, however the contract the McIlwain's signed, stated the producers would send the songs to radio stations, knowing the stations would not play them.

13.     Approximately three (3) weeks after aforementioned Item 12, Shawna and Mr. McIlwain came to Mr. Richardson's hunting camp again with tears in their eyes.  Mr. McIlwain asked Richardson if he would help Shawna.  Richardson knew the McIlwain families on both sides.  They were his friends.  Richardson said "yes", and started promoting Shawna without a contract.  When the Nashville people came down the next week, Shawna spent time with Sterling Whipple and Jerry Metcalf talking music with them and singing for them.  Soon, Whipple and Metcalf would go out to Shawna's house, talk music, and watch deer out of the McIlwain's kitchen window.

14.     Richardson carried Shawna to Nashville and introduced her to numerous writers, producers, record label executives, etc.  She was allowed to sing at Gilly's, The Stockyard, and other places.  While on this trip, Larry Butler, Larry Shell, Dick Donelson, Billy Joe Burdett, Lana Wood and others told Richardson that Shawna was going to be very good; he was going to have to spend a lot of time and money to get Shawna a contract.  He should get Shawna and her folks to sign a contract, even if she was a minor.

15.     On March 8, 1994, Shawna, Mickey McIlwain and Mattie McIlwain signed a contract with Richardson in the Washington County Probate Judge's office.  Said contract

5

was filed with the Probate Judge on June 19, 1996 at 10:43 a.m. in Book 0108, page 186.

Prior to the signing of the contract, Richardson gave the McIlwain's a copy of the contract

to take to their attorney, Bob Montgomery, who is now a circuit judge.

16.     The first item on the contract set out, Richardson would write and/or produce

quality song demos of radio quality to be presented to major publishers, producers, record

labels, managers, publicists, etc., and attempt to make contact with the same to promote the

career of Shawna, with Richardson bearing the expenses.  In 1994, Richardson hired

producers to produce a twelve (12) song demo.  According to Warner Brothers and many

Nashville experts, the demo album was excellent.  The album was mastered by Richardson

and Engineer, Bobby Smith.  The album cost Richardson the amount set out below:

| | | |
|---|---|---|
| 16.1 | Mastering and preparing the album | $5,000.00 |
| 16.2 | Liner layout | $  200.00 |
| 16.3 | 2000 Demo tapes | $2,600.00 |
| 16.4 | Preparing and mailing out 1,000 tapes | $1,300.00 |
| 16.5 | Dat and master reel | $   20.00 |
| | **TOTAL:** | **$9,120.00** |

17.     Richardson's costs for the production of each song are set out below:

17.1    Trip to Nashville for Shawna to work with Mark
        Gray and Sterling Whipple to record the album
        songs "Too Many Roses," "Put Your Lipps," and
        "You Made Me Love."

17.2    Five (5) days of my time - 16 hrs. per day        $4,000.00

6

| 17.3 | Rental Car | $ 300.00 |
| 17.4 | Gasoline | $ 60.00 |
| 17.5 | Lodging | $ 240.00 |
| 17.6 | Long distance phone calls | $ 30.00 |
| 17.7 | Food & Entertainment | $ 400.00 |
| 17.8 | Production & Studio (Mark Gray) | $1,000.00 |
| 17.9 | Production & Studio (Whipple & Jim Sales) | $ 700.00 |
| 17.10 | Back up singer, Dennis Miller | $ 200.00 |
| | **TOTAL:** | **$6,630.00** |

18.    Trip to Nashville for Shawna to meet Sterling Whipple and Jim Sales to produce the songs "Fading Away", and "Young Girl."

| 18.1 | Five (5) days of my time - 16 hrs. per day | $4,000.00 |
| 18.2 | Auto Expense - $.30/mile - 1,000 miles | $ 300.00 |
| 18.3 | Studio Time - Jim Sales | $ 800.00 |
| 18.4 | Studio Time - Whipple | $ 300.00 |
| 18.5 | Back-up singer, Dennis Wilson | $ 200.00 |
| 18.6 | Food | $ 350.00 |
| 18.7 | Lodging | $ 500.00 |
| 18.8 | Gasoline | $ 100.00 |
| | **TOTAL:** | **$6,550.00** |

]

19.    Trip to James Ducker Studio for Sterling
       Whipple to record music on "One More Day", and
       Shawna to record vocals.  Thirty-one (31) major
       music industry people in New York, California,
       and Tennessee were a part of a civil suit filed by
       Richardson over "One More Day."

19.1   Fifteen (15) hours of my time                       $ 750.00

19.2   Studio time                                         $1,000.00

19.3   Back-up singer, Wesley Breland                      $ 200.00

19.4   Gasoline                                            $ 100.00

19.5   Sterling Whipple expenses to drive down             $ 300.00

19.6   Sterling Whipple laying tracks and mixing           $ 300.00

19.7   Public Relations, taking Whipple and Metcalf
       hunting - 40 hours of my time                       $2,000.00

                              **TOTAL:**                   **$4,650.00**

20.    Additional expenses in public relations form to
       entice Whipple.                                     $ 300.00

20.1   Richardson gave Sterling Whipple a diamond
       Rolex watch                                         $2,500.00

20.2   Food and entertainment for twenty-nine (29)
       Guests (rented fish camp)                           $ 750.00

20.3   Daily food for Whipple for six (6) additional
       days                                                $ 300.00

20.4   Camp clean-up                                       $ 100.00

                              **TOTAL:**                   **$3,950.00**

8

21.   James Ducker session to produce album song
      "One More Kiss Before Goodbye."

| | | |
|---|---|---|
| 21.1 | Sixteen (16) hours of my time | $ 800.00 |
| 21.2 | Studio time | $ 600.00 |
| 21.3 | DAT | $ 10.00 |
| 21.4 | Master reel | $ 200.00 |
| 21.5 | Auto - 240 miles - had to make 2 trips - Mr. McIlwain had blood clot in his leg and I had to take him home late night. | $ 72.00 |
| 21.6 | Back up singer | $ 100.00 |
| 21.7 | Food | $ 20.00 |
| | **TOTAL:** | **$1,802.00** |

22.   Trip to Nashville to Jamie Whiting Studio to
      redo "One More Kiss Before Goodbye."

| | | |
|---|---|---|
| 22.1 | Four (4) days of my time | $3,200.00 |
| 22.2 | Production & studio | $1,000.00 |
| 22.3 | Three (3) studio musicians | $ 600.00 |
| 22.4 | DAT | $ 20.00 |
| 22.5 | Auto rental | $ 250.00 |
| 22.6 | Lodging | $ 480.00 |
| 22.7 | Food - entertainment | $ 400.00 |
| 22.8 | Gasoline | $ 75.00 |

|  |  | **TOTAL:** | **$1,025.00** |

23. James Ducker, Scott Rhodes session for Shawna to record "Don't Put Off Till Tomorrow," and Shawna and Lee Ferrell to record "Lonesome Sin."

| 23.1 | Ten (10) hours of my time | $ 500.00 |
| 23.2 | Studio time | $1,000.00 |
| 23.3 | Gave Ducker a new synthesizer | $ 400.00 |
| 23.4 | Food | $ 20.00 |
| 23.5 | Auto | $ 21.00 |
|  | **TOTAL:** | **$1,941.00** |

24. The second item on the contract sets out "mail demos" to major publishers, producers, record labels, managers, publicists, etc., and attempt to make personal contract with the same to promote the career of Shawna.  Richardson will bear all expense."

| 24.1 | Promotional trip to Nashville on Shawna's behalf. | |
| 24.2 | Five (5) days of my time - 16 hours/day | $4,000.00 |
| 24.3 | Rental car | $ 300.00 |
| 24.4 | Lodging | $ 300.00 |
| 24.5 | Long distance calls | $ 40.00 |
| 24.6 | Food | $ 400.00 |
| 24.7 | Gasoline | $ 50.00 |

| | | |
|---|---|---|
| 24.8 | Getting demos in the right hands | $ 700.00 |
| | **TOTAL:** | **$6,790.00** |
| 25. | Promotional trip to Nashville on Shawna's behalf. | |
| 25.1 | Four (4) days of my time - 12 hours/day | $2,400.00 |
| 25.2 | Auto rental | $ 250.00 |
| 25.3 | Lodging | $ 240.00 |
| 25.4 | Food for three (3) people | $ 350.00 |
| 25.5 | Long distance calls | $ 20.00 |
| 25.6 | Gasoline | $ 50.00 |
| 25.7 | Public Relations | $ 300.00 |
| | **TOTAL:** | **$4,610.00** |
| 26. | Promotional trip to Nashville on Shawna's behalf. | |
| 26.1 | Five (5) days of my time - 12 hours/day | $3,000.00 |
| 26.2 | Auto rental | $ 300.00 |
| 26.3 | Lodging | $ 300.00 |
| 26.4 | Long distance calls | $ 30.00 |
| 26.5 | Food for four (4) people | $ 400.00 |
| 26.6 | Public relations | $ 500.00 |
| | **TOTAL:** | **$4,530.00** |

27.     Promotion of Mark Gray and Shawna McIlwain
        Concert in Alabama

| 27.1 | Twenty-one (21) days of my time - 8 hours/day | $8,400.00 |
| 27.2 | One thousand (1,000) miles | $ 300.00 |
| 27.3 | Food for me and Mr. McIlwain | $  50.00 |
| 27.4 | Lodging for Mark Gray and three (3) guests | $ -0- |
| 27.5 | Food & entertainment | $ 800.00 |
| 27.6 | Clean-up camp | $ 100.00 |
| 27.7 | James Ducker Band opening $1,000 paid by McIlwain out of gate proceeds - Mark Gray paid out of gate and concessions by same. | $ -0- |
| 27.8 | Printing for posters | $ 250.00 |
| | **TOTAL:** | **$10,000.00** |

28.     Getting Shawna on program at the Flora-Bama
        Frank Brown Song Festival to perform "One
        More Day" with Sterling Whipple for the key
        people from Nashville.

| 28.1 | Nine (9) days of my time - 5 hours/day | $2,250.00 |
| 28.2 | Gas | $ 200.00 |
| 28.3 | Food | $ 200.00 |
| 28.4 | Public Relations | $ 700.00 |
| | **TOTAL:** | **$3,350.00** |

29.     Getting Shawna on the program with all the super
        stars at the Kenny Stabler Golf Classic.

12

| | | |
|---|---|---|
| 29.1 | Richardson's time and attendance | $2,000.00 |
| 29.2 | Food | $   50.00 |
| 29.3 | Gas | $ 100.00 |
| 29.4 | Long distance phone calls | $   40.00 |
| 29.5 | Public relations with Larry Butler, Stewart Harris, Tony Hazelton and Jim McBride. | $ 500.00 |
| | **TOTAL:** | **$2,690.00** |

30.  Getting Shawna and Lee Ferrell on Joy Ford's Bell Cove Program to perform for Mark and Janice Gray, Mr. and Mrs. Buddy Killian and a crowd of over 150 songwriters.

| | | |
|---|---|---|
| 30.1 | Ten (10) hours of my time | $ 500.00 |
| 30.2 | Gas | $ 100.00 |
| 30.3 | Lodging | $ 300.00 |
| 30.4 | Food | $ 250.00 |
| 30.5 | Public Relations | $ 300.00 |
| | **TOTAL:** | **$4,450.00** |

31.  Promoting Shawna's performing with her band for Kenny McClain at the Polo Club.

| | | |
|---|---|---|
| 31.1 | Twelve (12) hours of my time talking on the phone and meeting with McClain and Dan Corte and attending concert | $ 600.00 |
| 31.2 | Gas | $   20.00 |

| 31.3 | Long distance calls | | $ 100.00 |
| | | **TOTAL:** | **$ 720.00** |

32. Promoting Shawna and booking her at Bayfest Mobile, Alabama.

| 32.1 | Twelve (12) hours of my time | | $ 600.00 |
| 32.2 | Gas | | $ 40.00 |
| 32.3 | Food | | $ 20.00 |
| | | **TOTAL:** | **$ 660.00** |

33. Promoting Shawna and booking her at Blakely State Park - Spanish Fort, Alabama.

| 33.1 | Four (4) trips to Blakely - 8 hours my time | | $ 400.00 |
| 33.2 | Attend concert - 8 hours my time | | $ 400.00 |
| 33.3 | Public relations | | $ 400.00 |
| 33.4 | Advertising | | $ 500.00 |
| | | **TOTAL:** | **$1,700.00** |

34. Promoting Shawna and her band to perform at multi-millionaire Kenny McClain's wedding

| 34.1 | Time and expense | **TOTAL:** | **$ 400.00** |

35. Promoting Shawna and booking her to perform at Treasure Bay Casino, Biloxi, MS.

| 35.1 | Trip to Treasure Bay - three (3) hours my time | | $ 150.00 |
| 35.2 | Trip to attend concert - four (4) hours my time | | $ 200.00 |

| | | |
|---|---|---|
| 35.3 | Food | $ 50.00 |
| 35.4 | Mileage - 200 miles @ $.30/mi. | $ 60.00 |
| | **TOTAL:** | **$ 460.00** |

36. Promoting Shawna and trip to New Orleans to try and book Shawna with the Neville Brothers.

| | | |
|---|---|---|
| 36.1 | Eight (8) hours of my time | $ 400.00 |
| 36.2 | Food | $ 50.00 |
| 36.3 | Mileage - 400 miles @ $.30/mi. | $ 120.00 |
| | **TOTAL:** | **$ 570.00** |

37. Promoting Shawna and trying to book her at the Mobile County Fair

| | | |
|---|---|---|
| 37.1 | Three (3) hours of my time | $ 150.00 |
| 37.2 | Gas | $ 8.00 |
| | **TOTAL:** | **$158.00** |

38. Trip to Nashville and meeting with Starstruck A & R Director, Clay Myers

| | | |
|---|---|---|
| 38.1 | Three (3) days in Nashville - 6 hours/day | $3,000.00 |
| 38.2 | Lodging | $ 360.00 |
| 38.3 | Car Rental | $ 150.00 |
| 38.4 | Gas | $ 50.00 |
| 38.5 | Food for three (3) people | $ 100.00 |

|  | **TOTAL:** | **$3,830.00** |
|---|---|---|

39.   Trip to Fort Payne, Alabama to meet with Alabama's
Gaynell Pitts to get Shawna on Alabama's June Jam.
Warner Brothers called Richardson and told him that
they wanted him to bring Shawna to Nashville and set
up an appointment.  Danny Key said she was going to
Be Warner Brothers answer to Lee Ann Rimes.  Richardson
recorded this conversation.

| 39.1 | Sixteen (16) hours of my time | $ 800.00 |
|---|---|---|
| 39.2 | Auto expense | $ 30.00 |
| 39.3 | Lodging | $ 85.00 |
| 39.4 | Food | $ 60.00 |
|  | **TOTAL:** | **$ 975.00** |

40.   Trip to Birmingham meeting with George McMillan
to get Shawna on his Birmingham Twin Stages
Concert.  Warner Brothers made the aforementioned
call.

| 40.1 | Twelve (12) hours of my time | $ 600.00 |
|---|---|---|
| 40.2 | Car rental | $ 150.00 |
| 40.3 | Lodging | $ 60.00 |
| 40.4 | Food | $ 50.00 |
|  | **TOTAL:** | **$ 860.00** |

41.   Trip to Jimmy Rodgers to meet with Marty Gamblin,
who was managing Alan Jackson at that time.
Gamblin was a judge in the Rodgers Concert and
Shawna was performing in the contest.

| | | |
|---|---|---|
| 41.1 | Eight (8) hours of my time | $ 400.00 |
| 41.2 | Food | $ 20.00 |
| 41.3 | Gas | $ 24.00 |
| 41.4 | Lodging | $ 60.00 |
| | **TOTAL:** | **$504.00** |

42.     Trip to Mobile Country Music Association Talent Contest sponsored by radio station WABB in Mobile, Alabama.  Shawna won the contest.

| | | |
|---|---|---|
| 42.1 | Three (3) hours of my time | $ 150.00 |
| 42.2 | Food | $ 15.00 |
| 42.3 | Gas | $ 5.00 |
| | **TOTAL:** | **$170.00** |

43.     Trip to John Conley Concert in Soso, Mississippi to meet with John Conley and Mr. Rodgers about Shawna opening for John Conley.

| | | |
|---|---|---|
| 43.1 | Six (6) hours of my time | $ 300.00 |
| 43.2 | Food | $ 10.00 |
| 43.3 | Gas | $ 20.00 |
| | **TOTAL:** | **$330.00** |

44.     Trip to Peavy Music Company to promote Shawna and tried to get an endorsement for free music equipment.

| | | |
|---|---|---|
| 44.1 | Ten (10) hours of my time | $ 500.00 |

| | | | |
|---|---|---|---|
| 44.2 | Auto Expenses | | $ 90.00 |
| 44.3 | Food | | $ 10.00 |
| | | **TOTAL:** | **$600.00** |

45. Promoting Shawna in newspapers - Richardson got Shawna the coverage of a star.

| | | | |
|---|---|---|---|
| 45.1 | Thirty (30) hours of my time | **TOTAL:** | **$1,500.00** |

46. Pictures for demo album and portfolio, taken at Glamour Shots

| | | |
|---|---|---|
| 46.1 | Original picture | $ 130.00 |
| 46.2 | Permission from Glamour Shots to copy | $ 400.00 |
| 46.3 | 1,000 copies of photo | $ 530.00 |
| | **TOTAL:** | **$1,060.00** |

47. Items 1-5 of the Richardson/McIlwain Contract set out Richardson would prepare a portfolio for Shawna to promote her career. The contract set out Richardson would mail the portfolio to major publishers, producers, record labels, managers, publicists, etc. and bear all expenses of the same. Richards prepared a seven page color portfolio and gave Shawna the name "The Alabama Songbird." He designed the portfolio and mailed out 1,000 copies to CMA members from his address list given to him, in that he was a member in good standing of the CMA.

| | | |
|---|---|---|
| 47.1 | Twelve (12) hours of my time on portfolio layout | $ 600.00 |
| 47.2 | Printing costs - 2,000 copies | $2,400.00 |

47.3   Thirty-six (36) hours of my time to prepare and
mail out 1,000 copies                                    $1,800.00

47.4   Postage                                             $1,200.00

                                        TOTAL:   **$6,000.00**

48.    Richardson arranged for Shawna to open for Billy
Joe Royal on the Mississippi Coast.

48.1   Six (6) hours of my time - concert                 $ 300.00

48.2   Food                                                $  40.00

48.3   Gas                                                 $  20.00

48.4   Long distance phone calls                           $  10.00

                                        TOTAL:   **$370.00**

49.    Richardson spent an average of one (1) hour a day for twenty-six (26) months talking with music industry executives in Tennessee, New York and California promoting Shawna. Seven hundred eighty (780) long distance telephone calls. Six hundred ninety (690) man hours. Evidence accepted and not questioned in Federal Case No. 3:03-0150.

49.1   My time (690 hours)                                 $34,500.00

49.2   Long distance phone calls                           $ 2,700.00

                                        TOTAL:   **$37,200.00**

50.    Richardson payed the late great Larry Butler $1,000.00 to get Shawna's portfolio and demo album into the hands of several people Richardson could not reach.

19

**TOTAL:** $ 1,000.00

51.    Trip to Huntsville to meet with head of music company that handled Nascar Entertainment.  They offered Shawna a job to tour after her meeting with Warner Brothers.

**TOTAL:** $1,000.00

52.    Along or thereabout June, 1996, Warner Brothers Danny Key called Richardson and told Richardson that Warner Brothers Jim Ed Norman, had given he and Eric Prestridge an open checkbook to enter into contract with Shawna McIlwain and give her a ten (10) song album.  Mr. Key stated that Shawna was going to be Warner Brothers answer to Lee Anne Rimes.  An appointment was set up for Richardson to bring Shawna to Nashville to negotiate the contract and record a Sterling Whipple song titled "Fading Away" to be produced by Eric Prestridge.  After Danny Key called, Eric Prestridge called Richardson several times during the week, telling Richardson that he had the money for Shawna's album, then in a sarcastic way, he told Richardson that he had taken Sterling Whipple's wife away from him.  Richardson, who has been married for fifty-one (51) years to the same woman

was concerned about what type of man he was dealing with.  Based on Warner Brothers A&R Director, Danny Key, and their producers word, Richardson hired an attorney from one of the oldest law firms in Mobile, Alabama to assist in the negotiation meetings with Richardson, Shawna and Mickey McIlwain.

52.1   Five (5) hours of my time - talks with Danny Key
        and Eric Prestridge                                                    $ 250.00

| | | |
|---|---|---|
| 52.2 | Six (6) days in Nashville at 16 hours/day | $4,800.00 |
| 52.3 | Legal expenses to Lyons, Pipes & Cook, P.C. | $10,000.00 |
| 52.4 | Auto Expenses | $ 360.00 |
| 52.5 | Gasoline | $ 40.00 |
| 52.6 | Lodging | $ 378.00 |
| 52.7 | Long distance calls | $ 25.00 |
| 52.8 | Food & entertainment | $ 300.00 |
| | **TOTAL:** | **$16,153.00** |

53.     Richardson, Shawna and Mr. McIlwain arrived in Nashville the night before a meeting with Eric Prestridge on Monday.  We met again on Tuesday.  Prior to the Tuesday meeting, Richardson took Shawna and Mickey McIlwain to Attorney Jim Harris' office to hire independent counsel for Shawna.  Mr. Harris was recommended by well known writer/producer, Milton Brown of Mobile, AL.  Brown was the writer of Clint Eastwood movie songs.  Richardson will never forget Jim Harris' words to Shawna and Mickey McIlwain.  Mr. Harris stated "after looking at this contract, your portfolio and your demo album, I hope you appreciate what this man has done for you.  I have a daughter your age and I will put you over my knee if you do Mr. Richardson wrong.  I won't need to attend the Friday negotiations."

54.     On Tuesday, Richardson, Mickey McIlwain and Shawna and Richardson's attorney met with Warner Brothers, Eric Prestridge in the Warner Brothers loft recording

21

studio.  Prestridge called Bob Doyles office and had Whipple's music tracks on the song "Fading Away" sent to the loft.  Prestridge then asked Richardson, Mr. McIlwain and Richardson's attorney to leave, in order for him to work alone with Shawna in the studio. Four hours later, the song was recorded and a copy was given to Richardson.  After listening to the song in the Warner Brothers studio, Richardson went back to his motel and compared Prestridge's production with Whipples production.  Whipple worked with the song ten (10) hours and used a famous back-up singer, Dennis Wilson.  Prestridge worked four (4) hours with no back-up singer.  Whipple's work was far superior to the work of Prestridge.

55.     During the next couple of days, Prestridge, Richardson's attorney and Shawna toured Nashville at Richardson's expense.  Richardson had realized Prestridge had no intent in giving Shawna the full blown album, he and Danny key had promised in a provable implied-in-fact agreement.

56.     Prior to the Friday negotiation meeting, Richardson asked Danny Key "what happened to Lisa Biddy from Mobile, AL." Danny Key said that Warner Brothers had never signed a Lisa Biddy.  Richardson knew that Danny Key was lying.  Richardson was at Paw's Barn Showcase when Lisa Biddy was signed.  He had talked to Lisa Biddy and found that she signed a development contract, was used by Warner Brothers and then dropped.

57.     The Friday proposed contract signing meeting was a disaster.  Danny Key and Eric Prestridge refused to give Shawna the album they promised.  It was obvious to Richardson that Warner Brothers had been brainwashing Shawna and Mr. McIlwain, in the

22

presence of Richardson's attorney, because they knew they were going to offer her a development contract, and Richardson would object.  The meeting was short.  Warner Brothers offered a two (2) or three (3) song development contract, and wanted a private showcase performance, etc.  Richardson objected under Sections 1-9 of his contract with the McIlwains.  Richardson begged the McIlwains to give him a little more time and he would get the full contract.  He told Shawna that Warner Brothers would cancel the development contract if they found another female singer that they liked better, the development contract wasn't worth over $15,000.00, and she would wind up singing demos, waiting tables and playing for tips.  Several months later, Warner Brothers cancelled their contract with Shawna. They signed Amy Cochran.  The last time Richardson saw or spoke business with the McIlwains was in the Warner Brothers parking lot, when Eric Prestridge hugged Richardson's neck and told him "you're a good old country bumpkin, go on back to Alabama and enjoy Shawna, we will send you tickets and keep you informed.  You have created a superstar."

58.    A day or two later, Prestridge started calling Richardson's attorney at Lyons, Pipes & Cook, who was not authorized to speak for Richardson.  At this time, Richardson discovered the following:

58.1    Warner Brothers agreed to pay Jim Harris $200.00 per hour to represent Shawna and her parents even though Warner Brothers had never signed her. (7/19/1996).

58.2   Warner Brothers attorneys felt the Richardson contract was "air tight."

58.3   Shawna will not get full contract at the outset.

58.4   Jim Harris to review contracts, handle any contract questions. Richardson was out unless the McIlwains wanted him involved.

58.5   If Richardson insists on being in a position to approve all contracts, the deal is off. Richardson may endanger her future with Jim Edd Norman and perhaps the record business altogether. Eric wants out if Richardson is involved. Richardson has a bad reputation and he has done a lot of damage in town. Richardson has a remarkable lack of judgment.

58.6   The aforestated actions on behalf of Warner Brothers and its employees, Danny Key and Eric Prestridge against Richardson is clearly counts of tortious interference with a contract or business relationship, knowingly a violation of Richardson's constitutional rights, violation of Richardson's equal opportunity rights, intentional misrepresentation, fraud, wantonness, outrage, conversion, breach of implied duty of good faith and fair dealing, breach of trust, etc. Sections 1-9 of Richardson's contract required Richardson to be present.

59.   Defendant Shawna McIlwain Thompson stated on June 9, 1997, that on March 18, 1994, Richardson persuaded her to sign a document that he prepared titled "Agent Contract." Shawna said she did not have counsel, nor did Richardson do anything to ensure that she was either represented, or advised of her rights as a minor. Shawna fails to state that her parents, Mickey and Mattie McIlwain signed the said agreement with her. Such is false

24

to say the least.

59.1    Richardson gave Mr. McIlwain a copy of the Agent Contract two (2) weeks before it was signed by all parties. Mr. McIlwain stated that he had his attorney, Robert Montgomery review the contract. Mr. McIlwain also stated that Mr. Montgomery explained the State of Alabama Section 26-1-1 Code, on the status of minority. The contract was discussed with Mrs. Bill Johnson in the Washington County Probate Judge's office. Mrs. Johnson discussed the aforementioned law with all parties. Mr. McIlwain said he and Mrs. McIlwain had the authority to allow Shawna to sign the contract with them. The contract was signed and the Probate Clerk applied her notary seal. No one took advantage of Shawna. The contract was filed June 19, 1996 in the Probate Court in Book 0108, page 186.

59.2    Danny Key and Eric Prestridge misrepresented their intent to give Shawna a full blown album. They wanted her, but they wanted her for small change. They knew that Richardson held major management positions with Howard Hughes, Litton Industries and was the President and CEO of three (3) businesses that he owned. They also knew Richardson had held secret and top secret clearances working on highly classified programs. Shawna became the victim of a man who got his A & R Director job at Warner Brothers, coming in early and making Jim Edd Norman's coffee, and a man who was involved in a divorce proceeding and was driving a rusted primer coated van at that time.

60.    At Richardson's insistence, the Mobile Press Register questioned Danny Key of Warner Brothers, and Key told the newspaper that they were signing Shawna. However,

Richardson knew the Warner Brothers contract was going nowhere. He could not speak to Shawna and her folks because Warner Brothers through Attorney Jim Harris had instructed the parties to have no contact.

61.    Along or thereabout, November of 1997, Warner Brothers Danny Key called Richardson and asked him "if Shawna and her folks had settled the contract issue." Richardson told Key that he was well aware that the McIlwains could not pay for Richardson's time and expenses without the full blown contract and "to give her what you promised her. She needs to sue the hell out of you, Warner Brothers and Eric Prestridge." Danny Key said, "if she sues Warner Brothers, she will never get a contract in the music industry."

62.    A short time later, Danny Key told Richardson that Warner Brothers had cancelled Shawna's contract and fired Eric Prestridge. Further, Key said Richardson could have a song writing relationship with Warner Brothers. Richardson declined to sue Shawna.

63.    Richardson's character has been assassinated and continues to be assassinated by the Defendants, other people in Tennessee he has befriended, and people who don't even know him. Richardson loved Shawna like she was the daughter he never had. He still loves Shawna and is very proud of the fact she made it big. Richardson has never met Keifer Thompson, however he is a God gifted performer, and her rock to lean on now that Mickey is gone. Shawna never respected Richardson. Shawna used Richardson to get where she is. Richardson's money, time, loyalty and qualifications made Shawna a household name in

Nashville, New York and California.  He treated her with respect, never traveled anywhere with her without mutual friends, and was always a gentleman.  Richardson cannot understand her and her family's hate.  Shawna has not shown any appreciation or concern about Richardson's health.  She has acted as follows:

63.1    She has not spoken to Richardson since 2001.

63.2    Has never said "thank you."

63.3    Never invited Richardson to her wedding.

63.4    Knew Richardson had a stroke during settlement talks with the Defendants in 1996.  Never called him.

63.5    Knew Richardson had a heart attack in 1997.  Never called him.

63.6    Knew Richardson had six (6) bypass heart surgery in 2004.  Never called him.

63.7    Knew Richardson was placed in a hospice program for six (6) months to die. Never called him.

63.8    Co-wrote "If It Takes All Night," with a key defendant in Richardson's "One More Day Litigation."

63.9    Invited 250 people to Gavin Scarbrough's camp for a Christmas party.  None of these people ever spent time and money to help her.

63.10   Knew Richardson lost his last son in 2001.  Never called him.

64.     Richardson asks Defendants to pay for his expenses and time promoting Shawna, a total of $154,128.00. Richardson asks nothing for his time and expenses attending

and videoing band practices, attending local concerts, etc. Nothing from recording Artist

Royalties, Songwriter Royalties, Publisher Royalties, Live Performance Engagements,

Personal Appearances, Product Endorsements, Merchandising, etc., previously offered or the

contract percentage of her earnings.

65.     Although there was three (3) years of settlement offers, and counter offers, that

are not admissible in court, there was never a serious offer by the Defendants, because said

offers were made on "If's and But's". Had Richardson accepted the best offer, he would

have never received a dime because of time constraints.

## **COUNT 1 - FRAUD**

66.     The Plaintiff adopts and incorporates the allegations set out in all preceding

paragraphs as if fully set out herein.

67.     Said allegations of fact set out that Defendants Warner Brothers, Danny Key

and Eric Prestridge demanded changes in Richardson's contract after their attorney told them

the contract was "air tight" as follows:

67.1   Warner Brothers reviewed a contract that stated "The Terms and Conditions

of this Contract will not be disclosed or discussed with any other party wishing to sign

Shawna, without Richardson being present."

67.2   Warner Brothers made demands that Shawna have Richardson delete

Richardson-McIlwain Contract Sections 1-9 and 1-10. Their intent was to remove

Richardson from further negotiations, and allow an attorney they were paying to represent

28

Defendants Shawna, Mickey and Mattie McIlwain where they could get Shawna on their terms. Also, Defendants were eliminating Richardson from his right to require an accounting of Shawna's actual royalties.

67.3    Warner Brothers told Shawna and Richardson's attorney, that they wanted out of their implied-in-fact contract to sign Shawna, if Richardson was involved.

67.4    Warner Brothers initiated a development contract with Shawna, without Richardson's knowledge, and attempted to conceal their actions to gain control of Shawna by deception.

67.5    Warner Brothers deliberately slandered and libeled Richardson.

67.6    Warner Brothers required Shawna to terminate Richardson's power to represent Shawna under her contract with Richardson, before Shawna signed their contract.

67.7    Warner Brothers concealed the fact that they had terminated Shawna's contract with Warner Brothers, until ten (10) months after said termination.

67.8    Warner Brothers refused to furnish Richardson with a copy of their contract with Shawna.

68.     Said allegations of fact set out the fact that Warner Brothers was involved in an implied-in-fact agreement with Richardson to give Shawna a full blown album and failed to do so.

69.     Said allegations of fact set out that Richardson had contractural obligations and Warner Brothers prevented Richardson from adhering to part of the Richardson-

29

McIlwain contract.

70.     Said allegations of fact set out itemized expenses and time in the amount of $154,128.00 that Richards extended on the promotion of Shawna.  Warner Brothers knew that the Richardson-McIlwain Contract had a buy out clause in Section 3-1.  Richardson offered to sell his interest for $200,000 in order not to impede the signing of a major contract with Warner Brothers by Shawna.

71.     Warner Brothers was aware that Shawna could not buy out Richardson, because of their actions.  Warner Brothers knew that among other claims, Richardson had a strong "quantum merit claim", but took no action to relieve themselves and Shawna.

72.     Said allegations of fact set out that Shawna, Mickey McIlwain and Mattie McIlwain after being advised of Alabama's Minority Law, signed the Richardson-McIlwain Contract on March 18, 1994.

73.     Said allegations of fact set out that Shawna knew she owed Richardson $154,128.00 for his hard work and money that Richardson spent.

74.     When negotiations with Warner Brothers started Defendants Shawna and her parents told Warner Brothers "they wanted Richardson out of her career."  Richardson was aware that Shawna was using him because of four (4) years of her showing no respect, and Mrs. McIlwain throwing a screaming fit, calling Richardson a one-eyed SOB, among other filth at the Flora Bama, before hundreds of people from Nashville.

75. Records show that Defendant Shawna did not revoke Richardson's contractural rights for months before revoking his rights. Records show that no offers would have been fruitful because of technicalities and time constraints.

76. Defendants Shawna and her parents refused to enter into a lawsuit with Richardson against Warner Brothers.

77. The Defendants actions were fraudulent, reckless, deceptive, outrageous, abusive, forcible, harassing and in a form of theft by deception.

78. The Defendants falsely and maliciously secured the services of Richardson without pay, bringing about valuable compensation to said Defendants.

79. The Defendants knowingly and willfully used the services of Richardson, having no intention of fulfilling written and implied-in-fact contracts.

80. The Defendants actions contributed to Richardson having three (3) small strokes and two (2) heart attacks brought about by severe stress, mental anguish and a broken heart, and being placed in a hospice program to die.

81. The Court may throw out some of Richardson's counts, because statute has expired. However one can't remove the benefits the Defendants received from Richardson. Legal technicalities and quantum merit claims cannot be denied. The Defendants have the resources to pay the $154,128 they owe Richardson, and Richardson needs the money to pay large medical bills for he and his wife, that his insurance will not pay.

31

WHEREFORE, the above premises considered, Richardson prays that this Court will award him compensatory damages, including damages for emotional suffering and mental distress, punitive damages and such additional relief as the Court deems just and equitable under the circumstances.

## COUNT 2 - BREACH OF CONTRACT

82. Richardson adopts and incorporates the allegations of fact contained in all preceding paragraphs as if fully set out herein.

83. Defendants knowingly and maliciously breached written and implied-in-fact contracts with Richardson, and used deceptive means and methods to avoid fulfillment of said contracts generated by Defendants, and/or their agents.

84. The Defendants were involved in a well thought out plan of theft by deception in a reckless non-caring manner.

WHEREFORE, the above premises considered, Richardson prays that this Court will award him compensatory damages, including damages for emotional suffering and mental distress, punitive damages and such additional and further relief that the Court deems just and equitable under the circumstances.

## COUNT 3 - UNJUST ENRICHMENT

85. Richardson adopts and incorporates the allegations contained in all of the preceding paragraphs as if fully set forth herein.

86. Defendants, Shawna McIlwain Thompson's success is the result of extensive

32

time, labor, skill, talent and money invested in Shawna as set out herein.

87.     Months after Shawna fired Richardson, Richardson gave her several hundred copies of the promotional portfolio, demo and 8-1/2 x 11 color pictures.  In hard times after Warner Brothers fired Shawna, she continued to use the items produced by Richardson.

88.     The Defendants did not bear any of the expense with the development and promotion of Shawna, and/or the live exposure and/or the distribution of the promotional items and entities as set forth herein.

89.     The Defendants have never compensated Richardson one dime for his creation of promotional items, never shown any appreciation for his persistance, loyalty, and/or concern for his health they helped destroy.

90.     The Defendants negligently, wantonly and/or intentionally made the decision to make unauthorized use of the promotional items without Richardson's consent.

91.     The Defendants used Richardson for three (3) years, operating under an "Agent Agreement", then cancelled the said agreement.  The Defendants use of Richardson has unjustly enriched the same.

92.     The Defendants have the funds to compensate Richardson for his expenses, lost time from his family and businesses and the destruction of his health.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants that is fair and reasonable under the circumstances.

## COUNT FOUR - CIVIL THEFT

93.     Richardson adopts and incorporates the allegations contained in all the preceding paragraphs as if fully set out herein.

94.     The Defendants knowingly, intentionally and deceitfully used Richardson's money, time, promotional items, and entered into contract with Richardson, then fired him and cancelled defendants/Richardson contract, on a technicality, with the intent to deprive Richardson of his rights to be compensated at that time, or in the future.

95.     Richardson suffered financial damages, mental damage and physical damage as a proximate result of the foregoing, and continues to suffer the same.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants that is fair and reasonable, under the circumstances.

## COUNT FIVE - THEFT BY DECEPTION

96.     Richardson adopts and incorporates the allegations contained in all of the preceding paragraphs as if fully set out herein.

97.     Defendants, Warner Brothers, and their employees, Danny Key and Eric Prestridge owed a duty to Richardson to honor the Richardson/McIlwain contract.  Their attorneys told them it was "air tight."  They were legally bound by the said contract to negotiate with Richardson in accordance with the contract Sections 1-6, 1-9, 1019, 2-1 and 3-1.

34

98.     Defendant, Warner Brothers owed a duty to Richardson/McIlwain to give Shawna the contract they committed to do in an implied-in-fact agreement with Richardson.

99.     Defendants Warner Brothers and their employees, Danny Key and Eric Prestridge negotiated directly with Shawna, out of the presence of Richardson while she was still a minor, and induced her to suggest contract changes to Richardson, and demand Shawna get Richardson out of her life period. Defendant, Eric Prestridge actually threatened to get out of the deal if Richardson was not fired.

100.     Warner Brothers, and their employees, Danny Key and Eric Prestridge owed a duty to Richardson and Shawna to buy out Richardson's 10% interest in Shawna, set out in Richardson/McIlwain contract Section 3-1. Richardson made it clear that he would bow out if his expenses were paid. A $200,000 figure was set out. Warner Brothers and their employees knew the McIlwain's didn't have the money.

101.     Warner Brothers, and their employees, Danny Key and Eric Prestridge, slandered Richardson, and intimidated Shawna to revoke Richardson's powers under under the contract with Richardson, libeling Shawna and her parents. The actions by Warner Brothers, and its employees, was a clear violation of the United States Equal Opportunity Right to Work Laws.

102.     Defendant, Shawna McIlwain engaged in a deceptive collusion with Warner Brothers to violate Richardson's rights without compensating him.

103.   The Defendants actions were deliberate, forceful, intentional, fraudulent, wanton, outrageous, a breach of trust, and grossly negligent.

104.   The Richardson/McIlwain contract which Richardson and the McIlwains had been acting under, was never put before the court.  The reason being, all the Defendants knew the Court would also consider a "quantum merit claim" if the court voided the said contract.

105.   The Defendants attempted to conceal their actions and/or ignore the same.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants that is fair and just under the circumstances.

## COUNT 6 - OUTRAGE

106.   Richardson adopts and incorporates the allegations contained in all the preceding paragraphs, as if fully set out herein.

107.   The Defendants knowingly, recklessly and intentionally allowed the above counts and factual allegations to occur and deceitfully, recklessly and intentionally defrauded the Plaintiff and attempted to conceal their actions and/or ignore the same.

108.   The Defendants seriously damaged Richardson's health as follows:

108-1.  Richardson had three (3) light strokes.

108-2.  Suffers from major depression.

108-3.  Retired by Social Security on 100% total disability for severe depression in 1999.

108-4.  Had six (6) bypass surgery in February, 2001.

108-5.  Lost his last son on February 2, 2002.

108-6.  Was placed in a hospice program in 2006.

109.  The Defendants shows no concern, feelings, or made any attempt to check on Richardson.

110.  The Defendants conduct in this regard is so outrageous in character and so extreme in degree as to go beyond all bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized society.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants in an amount that is fair and just under the circumstances.

## COUNT 7 - BREACH OF IMPLIED DUTY
## OF GOOD FAITH AND FAIR DEALING

111.  Richardson adopts and incorporates the allegations contained in all the preceding paragraphs and counts, as if fully set out herein.

112.  Defendants were subject to an implied duty of good faith and fair dealing in conjunction with their contractual dealings, because of the Richardson/McIlwain contract Sections 1-6, 1-9, 1-10, 1-11 and 3-2.

113.  Defendants breached their duties to Richardson, by slandering Richardson, consistently breaching the Richardson/McIlwain contract, ignoring the contract, removing Richardson's contractual rights to negotiate on behalf of Shawna, and firing Richardson without compensating him, and attempting to conceal the same, with Warner Brothers,

Danny Key and Eric Prestridge calling the shots.

114.   Defendant Warner Brothers, Danny Key, and Eric Prestridge, breached their duties with Richardson and the McIlwains by destroying a lifetime relationship.  Such was done to gain control of young Shawna on their terms, with slanderous threats of cancelling their contract with her, if she did not do things that she had no legal right to do.

115.   Warner Brothers fired Danny Key, and Eric Prestridge in an attempt to eliminate themselves from liability that went to the level of President, Jim Edd Norman.

116.   Richardson suffered physical, mental, financial and emotional damages as a proximate result of said breach.

WHEREFORE, Richardson demands compensatory and punitive damages in an amount that is fair and just under the circumstances.

## COUNT 8 - CONVERSION

117.   Richardson adopts and incorporates the allegations contained in all the preceding paragraphs, as if fully set out herein.

118.   Defendants Warner Brothers and its employees, Danny Key and Eric Prestridge exercised unauthorized dominion over Shawna, and assumed control of her life, dropped their contract with her, resulting in years of hardship for her and her family, before her contract with Stoney Brook Records.

119.   Defendant Warner Brothers, and their employees, Danny Key and Eric Prestridge intentionally appropriated control of Shawna, for their own benefit, insisted she

cancel Richardson's contract, and left her without any representation and funding. Shawna's wonderful loving father, moved to Nashville for years to help Shawna and her husband.

120.    The foregoing acts were done to the exclusion of and/or in defiance of Richardson's rights to represent Shawna.

121.    The foregoing acts of the Defendants were willful and oppressive.

122.    Richardson has suffered damages as a proximate result of the foregoing, in that he has been deprived and continues to be deprived, of the value of his expenses and contract set out earnings which the Defendants have enjoyed and continue to enjoy.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants, in an amount that is fair and just under the circumstances.

## COUNT 9 - WANTONESS

123.    Richardson adopts and incorporates the allegations set out in all paragraphs and counts as if fully set out herein.

124.    The Defendants owed a duty to Richardson to act in its dealings with each other and Richardson, in a clear, concise, open business relationship, with no hidden deceptive actions, in conducting said negotiations of Shawna McIlwain's contract.

125.    The Defendants knew or should have known that their actions were undisciplined, deficient, unrestrained capricious, senseless, unprovoked, deliberate, malicious, ignoring justice, decency, morality and a wanton disregard for human rights.

126.   The Defendants wantonly breached their duty to Richardson, and at times even to themselves.

WHEREFORE, Richardson demands compensatory and punitive damages in an amount that is fair and just under the circumstances.

## COUNT 10 - INTENTIONAL MISREPRESENTATION

127.   Richardson adopts and incorporates the allegations contained in all of the preceding paragraphs as if fully set out herein.

128.   The Defendants knowingly and intentionally misrepresented their dealings and attempted to conceal their actions related to Richardson and his contract, in an attempt to prevent Richardson from discovering the real truth.

129.   The Defendants conduct was intentional, deceptive, reckless and forceful. Richardson and his wife are both seriously ill and the Defendants devious actions have caused Richardson severe physical and emotional distress and expense.  The Defendants, whose conduct in this regard is so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized society.

130.   The Defendants have intentionally withheld information from Richardson and recklessly concealed their dealings.

WHEREFORE, Richardson demands compensatory and punitive damages in an amount that is fair and just under the circumstances.

## COUNT 11 - ABUSE OF AUTHORITY

131.   Richardson adopts and incorporates the allegations contained in the preceding paragraphs as if fully set out herein.

132.   Warner Brothers and their employees, Danny Key and Eric Prestridge, have abused their legal authority with Shawna and her parents, having obtained a copy of the Richardson/McIlwain contract, which fully stated in Item 3-2 "the terms and conditions of this contract will not be disclosed, or discussed, with any other party wishing to sign Shawna, until Richardson is present."

133.   Defendant, Shawna McIlwain Thompson had no legal right to furnish Warner Brothers a copy of said contract until after said contract had been cancelled by Richardson.

134.   Warner Brothers and its employees, Danny Key and Eric Prestridge had no legal right to advise Shawna and her family to fire Richardson, intimidating the McIlwains, by telling them that Eric Prestridge wanted out if Richardson was involved, that Richardson had a bad reputation in town.

135.   The Defendants actions were reckless, deceptive, intentional, outrageous, wanton, negligent, forceful, harassing and a violation of Richardson's trust, constitutional rights, and the Federal Equal Opportunity Rights for him to earn a living in the music industry where Richardson was a contracted BMI writer and publisher.

WHEREFORE, the above premises considered, Richardson prays that this Honorable Court will award him compensatory and punitive damages for physical and emotional

suffering, and financial loss.

## COUNT 12 - BREACH OF CONFIDENTIAL RELATIONSHIP

136.  Richardson adopts and incorporates the allegations set out in all of the preceding paragraphs as if fully set forth herein.

137.  The Defendants were in a confidential relationship with Richardson with respect to their contract Section 3.2. The Defendants possibly lost a full blown contract with Warner Brothers. The details of the contract could have possibly worked out if Richardson had been present. Knowing about the relationship Richardson's attorney had with Shawna and Warner Brothers, one would think he was representing the McIlwains. In fact, the law firm forgave a $3,300 bill that Shawna has not been charged, because of conduct that was attrocious. Defendant, Mattie McIlwain told Richardson "if you fire your attorney, we will cancel your contract," and did the same.

138.  The Defendants breached this confidential relationship by knowingly, and intentionally causing or allowing, Warner Brothers to knowingly and intentionally deprive Richardson of the benefits to which he was and is due, for using Richardson's creative works and/or knowingly and intentionally attempting to conceal the unauthorized use of Richardson's creative works.

139.  Richardson suffered mental, physical, and financial damages as a proximate result of said breach, in that he has been, and continues to be deprived of the benefits to which he is rightfully entitled for his creation and promotion of Shawna.

42

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants in an amount that is fair and just under the circumstances.

## COUNT 13 - BREACH OF TRUST

140.   Richardson incorporates the allegations as set out in all paragraphs and counts, as if fully set out herein.

141.   From the onset of the allegation of facts and counts, the Defendants have conspired, deceived and committed despicable acts against Richardson.

142.   Richardson has known the McIlwain Defendants all of their lives.  He promoted Shawna a long time on an implied-in-fact agreement.  He would have trusted Mr. Mickey McIlwain with his life.

143.   The Defendants knowing there was a family type relationship between Richardson and the McIlwains so breached Richardson's trust.

144.   The Defendants owed a duty to Richardson, who trusted them to act in their dealings in accordance with their contract, in clear, concise business dealings with no hidden or deceptive actions.

145.   The Defendants knew, or should have known, that their actions were undisciplined, fraudulent, unrestrained, capricious, senseless, unprovoked, deliberate, intentional, malicious, wanton, ignoring justice and decency, violating Richardson's trust and having a complete disregard for his human rights.

146.    The Defendants violated a sacred trust.  Richardson suffered physical, mental, severe depression and financial damage as a proximate result of said breach, in that he has been and continues to be deprived of the benefits to which he is rightfully entitled for his time, promotion and creative works.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants in an amount that is fair and just under the circumstances.

## COUNT 14 - INTENTIONAL CONTRACT INTERFERENCE

147.    Richardson adopts and incorporates the allegations contained in all of the preceding paragraphs as if fully set out herein.

148.    Warner Brothers illegally reviewed the Richardson/McIlwain contract without Richardson present.  A clear violation of contract Section 3.2.

149.    Warner Brothers assumed control of Shawna's management when she was still a minor.  Even if Shawna had not signed a contract before she reached eighteen (18) in the State of Tennessee, Warner Brothers was calling the shots, and such was an implied-in-fact verbal contract.

150.    Eric Prestridge, stated "if Richardson was involved in negotiations in a position to approve contracts, the deal is off.  He wanted out if Richardson was involved." Warner Brothers attorneys who reviewed the confidential contract had told Prestridge the contract is "air tight."  At this time, Shawna had not relieved Richardson's contractural obligations.

44

151.   Danny Key and Eric Prestridge's involvement with the cancellation of the Richardson/McIlwain contract is a tortious interference with a contract.  Such a violation of federal law, as set out in Richardson's "Allegation of Facts", is a violation of Richardson's Equal Opportunity Rights and Constitutional rights.

152.   Shawna and the McIlwains involvement in the foregoing matter, is subject to the same scrutiny of the above, without compensating Richardson.

153.   The Defendants conduct was intentional, deceptive, reckless and forceful. Richardson has suffered mental, physical and financial damages as a proximate result of said "tortious interference" and still suffers from the same, and continues to be deprived of the benefits of which he is rightfully entitled to receive.

154.   The Defendants have not compensated Richardson for his creative works, and their use of the same.

WHEREFORE, Richardson demands compensatory and punitive damages of the Defendants in an amount that is fair and just under the circumstances.

## COUNT 16 - LIBEL AND SLANDER

155.   Defendants, Warner Brothers, Danny Key and Eric Prestridge, slandered Richardson by stating Richardson has a bad reputation in town, Richardson is a problem, Richardson has a remarkable lack of judgment, and Richardson could destroy Shawna's career.  They had conversations with Sterling Whipple, Mark Gray, etc., who was trying to get Warner Brothers to sign a girl he was working with at the same time.

45

156.    Shawna and her family have slandered Richardson for years for their lack of judgment.

157.    Such slanderous actions by the Defendants destroyed Richardson's career in the music business, was false, deliberate, intentional, undisciplined, fraudulent, unrestrained, malicious and wanton.

158.    Such slanderous actions have caused Richardson financial damage, loss of his business, loss of his music relationships, loss of his health and loss of seeing his lifetime friend, Mickey McIlwain, even at McIlwain's death.   The lack of appreciation by the Defendants McIlwain have driven Richardson to a point of depression while he is very sick.

WHEREFORE, Richardson demands compensatory and punitive damages in an amount that is fair and just under the circumstances.

## COUNT 15 - MISAPPROPRIATION

159.    Richardson adopts and incorporates the allegations contained in all the preceding paragraphs as if fully set out herein.

160.    The creative work, promotional items were the product and result of the extensive time, laser, skill and talent and money invested by Richardson to promote Defendant, Shawna McIlwain.

161.    The Defendants did not bear any expense associated with the development and production of the creative works, and/or of the distribution of the same to various individuals,

46

record labels, producers, publicists, etc., in Tennessee, New York, California, and many other states.

163.   The Defendants have never explicitly or implicitly been authorized to use Richardson's creative works after firing him.

164.   Richardson feels like he has been robbed without a weapon and cast out like a mangy dog.

WHEREFORE, Richardson demands compensatory damages and punitive damages in an amount that is fair and just under the circumstances.

## COUNT 16 - HEALTH DAMAGE

165.   Richardson adopts and incorporates the allegations contained in all preceding paragraphs as if fully set out herein.

166.   Richardson's health has been permanently damaged by the actions of the Defendants.  Warner Brothers and Shawna McIlwain Thompson's contract were on-going from 1996 to 1998.   Defendants refused to allow Richardson to participate in said negotiations, even though Richardson's contract with the McIlwains required Richardson to participate in said business actions.

167.   The Defendants did not initiate any action in court in Tennessee or Alabama, to test the legality of said contract.

168.   The Defendants failed to compensate Richardson a dime for his time, labor, skills, talent and money promoting Shawna for five (5) years, before and after the contract.

47

169.    The Defendants have not spoken to Richardson in eighteen (18) years.

170.    The stress, depression, no appreciation of Richardson's work, has resulted in Richardson's health problems as set out below.

170.1  Richardson had two (2) TIA's in 1996 and 1997.

170.2  Richardson had his first heart attack in 1998.

170.3  The United States Social Security Administration declared Richardson totally and permanently disabled in 1999 for "severe depression."

170.4  Richardson had a six (6) bypass heart surgery on January 1, 2001.

170.5  On February 2, 2002, Richardson's thirty-one (31) year old son died in his sleep.

170.6  In 2006, Richardson developed congestive heart failure, and five (5) of his arteries collapsed.  He was placed in a hospice program to die.  God intervened and grew Richardson collateral arteries.

170.7  Recently, Mickey McIlwain died.  Richardson begged family members to see his lifetime friend.  He was treated as if they never knew him.

171.    Richardson watches Thompson Square music performances and awards shows. He does not know Shawna anymore. He misses her beautiful hair and blue eyes when she was sixteen (16). He misses the beautiful voice singing ballads that were as good or better than any female that ever performed.

172.    Richardson does not understand her music, a mix between rap and R&B.

However, all the country artists are performing the same thing.

173.   It saddens Richardson greatly that independent writers can not get a cut. Most all the great songs, that play after forty (40) years were written by independent writers. Richardson knows a writer that has written over two hundred songs that have not been heard. He is not just a writer, he is a great writer and friend of Shawna's. Richardson is aware that Thompson Square wants to record songs that Shawna's husband wrote, because they make more money. This man has five (5) songs that would rate with any song ever written. He and Richardson have had seven (7) songs stolen. He kept Richardson from filing five (5) civil suits. He is fifty (50) years old and loyal to Shawna and Nashville. Actually, he wrote one (1) of the best songs ever written. One of Nashville's great artist has the song on five (5) of his albums. It is a shame that Shawna's record label didn't hire him. This man has the same dreams, Shawna. Do not forget him like you did me. Richardson produced the song.

174.   Richardson may die before this matter reaches court, if it has to be filed. However, an attorney who is famous in Alabama will represent the Richardson family.

WHEREFORE, Richardson demands compensatory damages and punitive damages in an amount that is fair and just under the circumstances.

## COUNT 17 - VIOLATION OF EQUAL RIGHTS EMPLOYMENT
## LAWS AND CONSTITUTIONAL RIGHTS

175.   Richardson adopts and incorporates the allegations contained in all preceding paragraphs and counts, as if fully set out herein.

176.   The unfair, illegal actions set out in this complaint as a whole, and actions conducted in the previous case 1:02CV-00305-CB-D (S.D.Ala), later transferred to Tennessee, Case No: 3:03CV-00150 (M.D. Tenn) has resulted in actions in the music business that have blacklisted Richardson and closed all doors to him.  An example is a letter written to Richardson that states in substance; "publishers and writers have joined together and producers are doing the same.  You are already in and recognized in New York, Los Angeles, or Tennessee, or you are out.  This is happening because of nuisance lawsuits compromising the industry's time.  We can't listen to wannabes."  This letter came from a senior employee of Doyle Lewis Management.  Fifteen (15) of the previous thirty-one (31) defendants in the aforementioned cases are now listed on Defendant, Shawna McIlwain Thompson's album, and are profiting from her, from being involved in a collusion between the same in the old legal proceedings.  Equal Opportunity is non-existent in the music industry.

177.   Richard demands that Defendants pay him his expenses of $154,128.00 for successfully promoting Defendant, Shawna McIlwain Thompson for five (5) years.

178.   In Civil Action No. 3:03-150, Defendants delayed discovery for two (2) years before a confidential settlement (M.D. of Tenn).

50

179.   In the case of Lonnie McIntosh, et. al., Case No. 3-97-0077, the music industry delayed case for four (4) years until the Plaintiff was granted a summary judgment in the United States District Court for the Middle District of Tennessee.

## COUNT 18 - QUANTUM MERIT

183.   Richardson adopts and incorporates the allegations contained in all the preceding paragraphs as if fully set out herein.

184.   The Defendants used Richardson for over five (5) years, without any intention of compensating him.

185.   The Defendants knowingly allowed Richardson to spend over $300,000 of his time and money supporting Defendant, Shawna McIlwain Thompson, per written contract and implied-in-fact (verbal) contract, then kicked Richardson out the door.

186.   Richardson has only requested the Defendants to repay one-half (½) of his expenses, $154,128, and has waived his right in accordance with the Richardson/McIlwain Contract to receive 10% of Shawna's recording artist royalties, songwriter royalties, publisher royalties, live performances, personal appearances, video performances, merchandising, etc., in a spirit of compromise.

WHEREFORE, Richardson prays that this Court will award him compensatory damages, his expenses, damages for emotional suffering, mental distress, punitive damages and such additional and further relief that the Court deems just, fair and reasonable, under the circumstances.

*Alton G. Richardson, pro Se*

ALTON G. RICHARDSON, Pro Se
1118 Martha Alleyn Drive
Saraland, AL 36571
Phone: (251) 675-8313

## CERTIFICATE OF SERVICE

I hereby certify that I have on this _15th_ day of _October_, 2013, I have served a copy of the foregoing complaint on the following named individuals, by placing a copy of said document in the United States mail, properly addressed with first class postage prepaid, as follows:

Warner Brothers Music
20 Music Square East
Nashville, TN 37203
Phone: (615) 748-8000

Shawna McIlwain Thompson
Stoney Creek Records
207 18th Avenue South
Nashville, TN 37203

Mattie McIlwain
General Delivery
Chatom, AL  36518

Hon. Tiffany Dunn
Loeb & Loeb, P.C.
1906 Acklen Avenue
Nashville, TN 37212

Eric Prestridge
c/o Warner Brothers Music
20 Music Square East
Nashville, TN 37203

Danny Key
C/o Warner Brothers Music
20 Music Square East
Nashville, TN 37203

Stoney Creek Records
207 18th Avenue South
Nashville, TN 37203

*Alton G. Richardson*

ALTON G. RICHARDSON

52